**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5002-15T4

ANTHONY LATTANZIO and
LINDA LATTANZIO,

    Plaintiffs,

v.

QUALITY TECHNOLOGIES SERVICES,
LLC, KAJIMA BUILDING AND
DESIGN GROUP, SCHOLES ELECTRIC
CO., KNOBLOCH PLUMBING AND HEATING,

    Defendants,

and

QUALITY TECHNOLOGIES
SERVICES, LLC,

    Defendant/Third-Party
    Plaintiff-Respondent,

v.

HULL-VICCI CONSTRUCTION
CORP.,

    Third-Party Defendant/
    Appellant.

_____

       Submitted September 25, 2017 - Decided August 22, 2018

       Before Judges Accurso, O'Connor and Vernoia.

On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-1143-11.

Braff, Harris, Sukonek & Maloof, attorneys for appellant (Jerald F. Oleske and Robert M. Brigantic, on the briefs).

Margolis Edelstein, attorneys for respondent (Colleen M. Ready and Thomas L. Grimm, on the brief).

PER CURIAM

In this breach of contract action, third-party defendant Hull-Vicci Construction Corp. appeals from a judgment of $554,833.33 plus pre-judgment interest in favor of third-party plaintiff Quality Technologies Services, LLC following a bench trial. Because the factual findings and legal conclusions of the trial judge are supported by substantial, credible evidence in the trial record, we affirm.

This appeal arises out of a Hull-Vicci employee's fall from a scaffold in the course of demolition work for Quality Technologies in a building Quality occupied in Jersey City. Following a jury verdict in favor of the construction worker, Quality, whose negligence the jury found attributed to fifty-five percent of the worker's losses, paid the entire judgment of $1,512,500, two-thirds of which was to be reimbursed by its co-defendants. Quality pursued this action against Hull-Vicci to recover its one-third share of the judgment and $152,000 in

2                                                    A-5002-15T4

defense costs it incurred in defending the suit, based on Hull-Vicci's failure to obtain the additional insured coverage specified in the parties' contract.

The contract required Hull-Vicci to procure a CGL policy "on a coverage form at least as broad as the most recent edition of Commercial General Liability Coverage Form (CG 00 01) as published by the Insurance Services Office, Inc.," in the aggregate limit of at least $3,000,000, naming Quality as an additional insured "using an endorsement form at least as broad as the ISO Additional Insured Endorsement Form CG 20 10 11 85." Hull-Vicci does not dispute that it failed to obtain additional insured coverage as broad as that provided by Form CG 20 10 11 85, which all agree would provide coverage for Quality's own negligence. Indeed, the parties stipulated that the policy language of the two additional insured endorsements Hull-Vicci had in place at the time of the accident were more restrictive than the Form CG 20 10 11 85 endorsement and did not comply with the insurance requirements in the parties' contract. Specifically, both endorsements limited coverage to injuries caused in whole or part by Hull-Vicci or those acting on its behalf. They provided no coverage to Quality for its own negligence.

Following the verdict in the underlying action, the parties cross-moved for summary judgment on Quality's breach of contract claim. The motion judge had no hesitation finding Hull-Vicci breached the contract by failing to procure the insurance clearly and unambiguously specified in the parties' contract. The judge withheld summary judgment, however, based on a dispute of fact underlying Hull-Vicci's defense of impossibility of performance.

Specifically, the parties submitted conflicting certifications from persons knowledgeable about commercial insurance regarding the availability of the coverage called for in the contract. Hull-Vicci's insurance agent averred the coverage was not available in the New Jersey market at the time of the accident. He claimed the endorsement was no longer in existence and it was not possible to procure an equivalent. Quality's insurance expert certified it was possible to obtain an additional insured endorsement with coverage equivalent to the form specified in the contract. Because the conflicting certifications precluded resolution of Hull-Vicci's impossibility defense on summary judgment, the motion judge denied both motions without prejudice and permitted the parties to take discovery on the issue.

Another judge eventually heard two days of testimony to resolve the issue reserved on the motion, that is, whether Hull-Vicci should be relieved of the obligation it undertook in the contract to obtain the additional insured endorsement specified, by virtue of the impossibility of performance. The judge also heard testimony on Hull-Vicci's additional defenses, that the claim should be dismissed for failure to join an indispensable party, that the contract had not been signed prior to the accident and thus was not in force on that date, that Quality waived provision of an additional insured endorsement ISO Form CG 20 10 11 85 or its equivalent, that Hull-Vicci did not breach the contract, that Pennsville Shopping Center Corp. v. American Motorists Ins. Co., 315 N.J. Super. 519 (App. Div. 1998) bars the claim and that Quality had no damages.

Six witnesses testified, the vice president of Hull-Vicci, who executed the contract on its behalf; Quality's vice president of facilities, who executed the contract for Quality; Quality's facility manager and its assistant manager responsible for obtaining certificates of insurance confirming additional insured coverage provided to Quality; the customer service representative of Hull-Vicci's insurance agent; and the agency's vice president of commercial lines, who testified about the coverage available in the market at the time of the accident but

was not offered as an expert.  We highlight only those portions of the testimony required to provide context for our decision.

Hull-Vicci's vice president testified the company had performed general contracting work for Quality at various locations over a period of more than twenty years and did so both before and after the accident.  He maintained he was the only person at Hull-Vicci to have reviewed the contract before he signed it; that he could not recall whether he read or reviewed the provisions relating to Hull-Vicci's obligation to obtain insurance coverage for Quality before signing; that he was not aware at that time as to whether Hull-Vicci's CGL policy with Penn National had an additional insured endorsement; and that he never sought the opinion of legal counsel or any insurance agent about the contract's insurance requirements.  He also testified he did not sign the contract until well after the accident, although he acknowledged the contract provides it was made and entered into on a date preceding the accident, and that when Hull-Vicci began its work on the project, he believed it was performing the work referenced in the contract.

Quality's vice president of facilities testified that Quality's counsel drafted the contract, and that Hull-Vicci did not raise any questions or concerns about its terms or conditions.  He claimed Hull-Vicci did not seek to negotiate the

terms and never asked to condition the contract on Hull-Vicci's ability to procure the insurance specified. He did not remember the date he signed the contract but noted its effective date was printed on the first page.

Quality's assistant facilities manager testified he sent Hull-Vicci sample certificates of insurance it was to use, one for Quality and one for its landlord, asking that the company update the certificates using "the verbiage" on each sample. He claimed he received a completed certificate for Quality from Hull-Vicci's insurance agent with limits $2,000,000 below that required. He accordingly sent an email to Hull-Vicci's vice president returning the certificate provided for Quality, explaining the discrepancy as to limits and asking that the certificate be corrected and reissued. He wrote: "the verbiage on the [certificate of insurance] is fine, it's only the limits amount that need to be updated."

The customer services representative for Hull-Vicci's insurance agent testified she was the representative assigned to Hull-Vicci's account and had issued certificates of insurance at its request for many years. She prepared a certificate of insurance for Quality at Hull-Vicci's request, relying solely on information supplied by the company, and sent it to the assistant facilities manager at Quality. She testified she was

not provided with either a copy of the contract or its insurance requirements. She simply issued the certificate using the sample Hull-Vicci provided. She further testified she reissued the certificate at Hull-Vicci's request, clarifying that the company maintained a $1,000,000 primary policy and a $2,000,000 umbrella, for a combined total of $3,000,000.

The most significant testimony was offered by the vice president of the commercial lines department of Professional Insurance Associates, Inc., Hull-Vicci's insurance agent. Employed as an insurance agent licensed to place commercial general liability insurance for thirty-eight years, he testified he was both familiar with Hull-Vicci and the coverage available under CGL policies with an additional insured endorsement. He testified that to his knowledge at the time of the accident in 2010, the only additional insured endorsement available for purchase from insurers was the 2004 edition of CG 20 10, which would not have provided coverage for Quality's own negligence. He claimed the 1985 version of the endorsement was no longer in use after 1995.

The agent conceded, however, that Hull-Vicci never asked him to secure the coverage provided by the 1985 version of the endorsement and he never tried to do so. When asked by the court about the availability of a manuscript endorsement as

broad as the coverage provided in the 1985 version, he replied, "I suppose that could be done," and "I guess somebody would do that." He conceded he did not know how much such coverage would cost, but agreed with Hull-Vicci's counsel that it was "presumably" expensive, estimating it might be more than triple the cost.

Hull-Vicci's annual premium for the CGL policy in effect at the time of the accident was under $20,000 according to documents admitted into evidence at the hearing. The parties stipulated that ISO Form CG 20 10 11 85 was not illegal, was never withdrawn per the New Jersey Department of Banking and Insurance and "can still be used" in New Jersey. Counsel for Hull-Vicci explained at the outset of the hearing that the company was not contending it was impossible to obtain the endorsement but was "not conceding impracticality."

After hearing the testimony, the judge issued a written opinion finding the contract clear and unambiguous and rejecting each of Hull-Vicci's defenses to performance. Specifically, the judge found our holding in Pennsville, that an additional insured endorsement in a shopping center tenant's policy provided no coverage for the landlord for a slip-and-fall claim in the parking lot in light of the express disavowal of the tenant's liability for such claims in the lease, 315 N.J. Super.

at 521, 523, had no applicability here.  The judge found Hull-Vicci's reliance on <u>Pennsville</u> "ignores the clear language of the contract requiring an additional insured endorsement of Form 85 or equivalent," expressing the parties' explicit intent that Hull-Vicci provide "coverage to [Quality] for its 'concurrent and <u>sole</u> negligence,'"[1] (quoting the contract, emphasis added). See <u>Franklin Mut. Ins. Co. v. Sec. Indem. Ins. Co.</u>, 275 N.J. Super. 335, 340-41 (App. Div. 1994).

The judge dismissed Hull-Vicci's arguments as to the effective date of the contract and waiver as unsupported by the

---

[1]  The exact language of the contract provides:

> III.  GENERAL PROVISIONS (APPLICABLE TO ABOVE)
>
> . . . .
>
> D.  Additional Insured.  The CGL and Business Automobile Liability policies each must name the Owner and the other Indemnified Parties identified in Section 7 of the Agreement, as Additional Insureds, <u>using an endorsement form at least as broad as the ISO Additional Insured Endorsement Form CG 20 10 11 85 or ISO Additional Insured Endorsement CG 20 10 10 01 if used with ISO Form 20 37 10 01 (or their combined equivalent)</u>.  It is the intent of the parties to this Contract that this Additional Insured status shall include coverage for complete operations <u>and for the Owner's concurrent and sole negligence</u>.
>
> [Emphasis supplied.]

A-5002-15T4

evidence. He found the contract effective as of the June 7, 2010 date specified in the contract, consistent with the testimony of the individuals who signed it, Hull-Vicci's vice president and Quality's vice president for facilities. See State Troopers Fraternal Ass'n v. State, 149 N.J. 38, 49 (1997) (holding determination of the date controlling application of a contract "must be derived from the intent of the parties, and if no subjective intent is apparent or ascertainable, that intent must be based on the objective language of the contract").

As to waiver, the judge found there was no view of the parties' dealings that would support Quality having relinquished its right to ISO Additional Insured Endorsement Form CG 20 10 11 85 by its acceptance of the certificates of insurance provided by Hull-Vicci.[2] See Cty. of Morris v. Fauver, 153 N.J. 80, 104-05 (1998) (noting waiver presupposes full knowledge of a right and its intentional surrender). The judge found the testimony made clear the individuals dealing with the certificates for the parties, Hull-Vicci's vice president and Quality's assistant facilities manager, "were unaware of insurance niceties and

---

[2] We note the certificate Hull-Vicci relies on to support its waiver argument on appeal is not the one for Quality but the one for Quality's landlord. Given counsel's obvious familiarity with the file, it is hard to accept the error was one of inadvertence.

inexperienced in insurance."  He found they "had little understanding of insurance requirements" and "were unfamiliar with the insurance provisions, endorsements and forms referred to in the contract," and thus the facts could not support waiver.

The judge found the testimony of Hull-Vicci's insurance agent made plain beyond any doubt that Hull-Vicci's performance under the parties' contract was neither impossible nor impracticable.  See Petrozzi v. City of Ocean City, 433 N.J. Super. 290, 302 (2013) (quoting Connell v. Parlavecchio, 255 N.J. Super. 45, 49 (App. Div. 1992)) (noting either circumstance a complete defense "where a fact essential to performance is assumed by the parties but does not exist at the time for performance").  Noting the Model Jury Charge on impossibility required a defendant to show four things:  first, that the event defendant claims made performance impossible actually occurred; second, that it made keeping defendant's promise impossible; third, that neither party reasonably foresaw the event when they made the contract; and fourth, that the event making performance impossible was beyond defendant's control and was not its fault, see Model Jury Charges (Civil), 4.10N, "Affirmative Defenses" (approved Nov. 1999), the judge found Hull-Vicci could prove none of them.

Most important, the judge found the agent's testimony made clear "no supervening event occurred after the contract was executed" because "[t]he status of Form 85 was the same before and after [Hull-Vicci's] contractual undertaking." The court noted "[n]othing happened regarding Form 85 after the contract was signed." Based on the testimony of Hull-Vicci's own insurance agent, the judge found "[t]he defense of impossibility of performance lacks merit."[3]

The judge rejected Hull-Vicci's claim of mutual mistake because the contract unambiguously required Hull-Vicci to secure additional insured coverage at least as broad as that provided by ISO Additional Insured Endorsement Form CG 20 10 11 85, and there was no evidence presented at the hearing "that any party had any understanding different from the clear terms of contract, no evidence that [Quality] was laboring under any

_____

[3] Hull-Vicci's assertion that the trial judge's rejection of its "primary substantive defense to this claim, i.e., impossibility" was premised on the opinion of an expert who did not testify based on a stray remark in the opinion is contrary to the record. The judge detailed his several reasons for finding Hull-Vicci could not establish the defense of impossibility of performance, including its own stipulations that the coverage was not impossible to obtain, that ISO Form CG 20 10 11 85 was not illegal, was never withdrawn per the New Jersey Department of Banking and Insurance and "can still be used" in New Jersey. The court's passing reference to an expert's opinion included in a trial brief but ultimately not called to testify, is an inconsequential flaw in an otherwise sound opinion.

misapprehension of fact, and no evidence of fraud or unconscionable conduct." The judge found "[o]ne need not understand insurance arcana to be bound to the clear meaning of a contract containing such terms. . . . [T]here was no mutual mistake."

The judge likewise rejected Hull-Vicci's argument that the contract was internally contradictory as it required the most recent ISO CGL form but an "outdated and unavailable" additional insured endorsement, and that because Hull-Vicci maintained two "additional insured endorsements in current ISO form" it could not be considered in breach. The judge found no inherent ambiguity in the contract because the provision requiring Hull-Vicci to maintain comprehensive general liability insurance is plainly "separate and distinct from the provision for additional insurance." Because the two additional insured endorsements Hull-Vicci maintained did not provide the additional insured coverage it promised to Quality, and the court had already found its performance was not excused by impossibility, impracticability or mutual mistake, the judge deemed this claim as without merit.

Finally, the judge dispatched as utterly without merit Hull-Vicci's arguments that the claim should be dismissed because Quality had failed to name an indispensable party, Hull-

Vicci's CGL carrier, Penn National, and could not show damages. The judge noted Hull-Vicci provided no support for its novel argument that Quality's breach of contract claim "is more aptly characterized as a challenge to Penn's coverage determination" requiring Penn National's participation in this action. As to damages, the judge found Quality proved Hull-Vicci breached its contract, causing Quality to be without defense or indemnity for Lattanzio's suit; resulting in damages of $554,833.33, one-third of the aggregate loss, plus pre-judgment interest. Hull-Vicci's assertion that Quality's co-defendants are obligated to pay Quality more than their two-thirds share of the aggregate loss finds no support in the record.

Hull-Vicci appeals, reprising the arguments it made to the trial court. We find none of these arguments of sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(1)(E). A review of the hearing testimony makes plain that none of Hull-Vicci's defenses to this straightforward claim has any merit and several border on frivolous. As to its primary defense, impossibility of performance, Hull-Vicci explicitly conceded at trial that it was not asserting that additional insured coverage equivalent to the ISO Additional Insured Endorsement Form CG 20 10 11 85 specified in the contract was impossible to obtain and it put on no proofs as to the

impracticability of performance. Its insurance witness, not presented as an expert, conceded a manuscript endorsement matching the coverage was possible and Hull-Vicci presented nothing to suggest the premium was in any way cost prohibitive or unaffordable.

Moreover, as the trial judge found, nothing changed as to the availability of that coverage following the effective date of the contract. We agree with the court that the absence of any supervening event renders the defense unavailable to Hull-Vicci. See Facto v. Pantagis, 390 N.J. Super. 227, 231 (App. Div. 2007).

Because a review of the transcript reveals substantial evidence supporting the court's findings and conclusions, see Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011), we affirm, substantially for the reasons expressed in Judge Paley's written opinion of June 10, 2016.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5002-15T4